IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:09cr430 |
| v. ) | |
| ) | Hon. Anthony J. Trenga |
| FIDELINO FERRUFINO, ) | |
| ) | Sentencing Date: October 22, 2010 |
| Defendant. ) | |

POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States hereby submits its position on the sentencing of the defendant, Fidelino Ferrufino, in accordance with U.S.S.G. § 6A1.2 and the policy of this Court.

**I.   Background**

On August 4, 2010, a jury found the defendant guilty of one count of conspiracy to commit bank and wire fraud, in violation of 18 U.S.C. § 1349. The defendant's conviction stems from his role in a wide-ranging mortgage fraud conspiracy, in which he and others secured fraudulent loans for "straw buyers" with good credit to purchase properties for other individuals.

The Probation Office calculated the defendant's total offense level as 32, his criminal history category as I, and the applicable Guidelines range as 121 to 151 months of imprisonment. The government believes that the Guidelines calculations are accurate. As discussed below, and based on the factors set forth in 18 U.S.C. § 3553(a), the government submits that a sentence of 97 months of imprisonment is reasonable and appropriate in this case.

**II.     Argument**

   **A.     Applicable Legal Standards**

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264). The Supreme Court has directed that district courts "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38 (2007). However, the sentencing court "may not presume that the Guidelines range is reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Gall*, 552 U.S. at 49; *see also Clark*, 434 F.3d at 685.[1] Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

   **B.     Defendant's Role in the Conspiracy**

The evidence at trial showed that the defendant conspired with Ruben Rojas and other individuals to defraud banks into lending funds for the purchase of houses in northern Virginia that the buyers of the properties were not qualified to receive. The defendant recruited several "straw buyers" to use their names and credit to secure financing for the properties. The straw buyers often obtained loans for 100% of the purchase price of the properties and often purchased

---

[1] Pursuant to § 3553(a), the district court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted disparities; and (7) the need to provide restitution to victims of the offense.

multiple properties within a short period of time. The straw buyers signed false and misleading loan applications in order to obtain much larger loans than they were qualified to receive; the fraudulent loan applications misstated, among other things, income, assets, employment, citizenship status, and intent of the purchaser to live in the property. The loan applications almost always failed to list the straw buyers' liabilities, most notably other properties that the straw buyers had purchased in the recent past.

Ruben Rojas testified at trial that he met the defendant through his brother, Grovert, and that he and the defendant eventually began working together. According to Rojas, the defendant would recruit straw buyers for him in exchange for a referral fee. The defendant knew that the buyers he recruited were unqualified to obtain loans and he was aware that Rojas and others were falsifying the buyers' information on the loan applications. Rojas testified that the defendant recruited approximately 25 buyers, none of whom were qualified to obtain their loans, and that he paid the defendant a total of approximately $80,000 for his work. At trial, the government introduced checks from Rojas to the defendant that totaled approximately $85,000. Rojas also testified that the defendant bought at least three homes himself as a straw buyer and that he sold one of those properties, 6210 Julian Place, to another straw buyer so that he could get the equity out of the house.

Litcia Linares corroborated Rojas' testimony at trial. Linares testified that she knew the defendant through her husband, Grovert Rojas. Linares testified that she heard conversations between Grovert and the defendant, during which they discussed falsifying information for straw buyers, such as employment. Linares also testified that, as a real estate agent, she used straw buyers recruited by the defendant. Linares testified that at all points during her business dealings

with the defendant he never referred a single legitimate buyer to her.

Jorge Mendez testified at trial that the defendant began to work for him in 2007, after the defendant's relationship with Rojas ended.  The defendant worked with Mendez, a real estate agent, in the same capacity — recruiting buyers who were unqualified to obtain loans.  Mendez testified that it was the defendant who approached him with the idea and that the two agreed to split Mendez's commissions 50/50.  According to Mendez, the defendant brought in the people who wanted to buy houses but couldn't qualify for the loans and Mendez recruited the straw buyers (or, as he called them, "co-signers").  Mendez testified that the defendant knew that the people taking out the loans would not be living in the houses and that the straw buyers' information would be falsified on the loan applications.  The government introduced into evidence Mendez's spreadsheets detailing his business transactions with the defendant, some of which specifically listed the 1% payments to the straw buyers and, on some occasions, kickbacks to the occupants of the properties.  Mendez testified that he reviewed the spreadsheets with the defendant and used the spreadsheets to generate a 1099 for the defendant at the end of the year.  Mendez estimated that he paid the defendant over $75,000 for the defendant's role in the scheme.  The government introduced the checks from Mendez to the defendant into evidence at trial.

During the course of the conspiracy, the defendant and his co-conspirators engaged in over thirty fraudulent property transactions in the Eastern District of Virginia and obtained over $24 million in mortgage loans to purchase the properties.  The straw buyers defaulted on the bulk of the fraudulent loans and the properties either went into foreclosure or were short-sold for sizeable losses.  As a result of their conduct, more than twenty banks and lenders suffered total

losses in excess of $9 million. The loss attributable to the defendant's direct participation in the scheme — for the properties in which he played a role as a recruiter and/or straw buyer — is in excess of $3 million.

### C.  Sentencing Recommendation

The government submits that a sentence of 97 months of imprisonment would serve the factors set forth in § 3553(a) and is reasonable and appropriate in this case for several reasons.

#### 1.  Nature of the Defendant's Conduct

First, a sentence of 97 months is appropriate and reasonable in light of the nature of the defendant's criminal conduct and his refusal to accept responsibility for his actions. The defendant engaged in a serious and lengthy crime. The defendant's conduct did not represent a momentary lapse of judgment or even a narrowly focused fraud. His fraud was widespread, lasted multiple years, and affected numerous financial institutions and mortgage lenders. Moreover, the defendant did not exit this scheme willingly. To the contrary, Rojas testified that he ceased doing business with the defendant after he discovered that the defendant was negotiating with the straw buyers on the side in an effort to squeeze out a larger profit for himself. Once his role in the Rojas conspiracy had run its course, the defendant approached Jorge Mendez and proposed that they perpetrate a similar scheme. That scheme, too, caused widespread damage to several financial institutions.

The defendant participated directly in fraudulent mortgage transactions resulting in losses in excess of $3 million. He recruited approximately 25 participants into the scheme and caused losses to numerous financial institutions. All of those factors must be taken into account in fashioning an appropriate sentence. The Guidelines range of 121 to 151 months holds the

defendant accountable for the entire loss of the conspiracy, which is more than $9 million. If the defendant were only held accountable for his own conduct — which resulted in a loss of over $3 million — the Guidelines range would be 97 to 121 months. The government submits that a sentence of 97 months of imprisonment would reasonably and appropriately account for the severity of the defendant's conduct and the financial loss that was sustained as a result.

Section 3553(a)(2)(A) also requires the sentence to "promote respect for the law." The defendant, through his offense conduct, has shown a complete disrespect for the law. As discussed above, the defendant — by recruiting the straw buyers and acting as a straw buyer himself — played a critical role in carrying out the conspiracy's fraudulent purposes. In short, the defendant took proactive and affirmative steps to help the conspiracy succeed. This serious conduct calls for a sentence that includes a significant period of incarceration.

### 2. Deterrence

In addition, a significant sentence is necessary and appropriate to afford both specific and general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). This conspiracy included a number of lead participants as well as multiple straw buyers. Because the mortgage loan process relies heavily on the integrity of the real estate agent, loan officer and home buyer, the complicity of all three was critical to the success of the underlying conspiracy. And there is no question that the conspiracy did succeed; it resulted in fraudulent loans for more than thirty properties totaling well over $24 million. Therefore, in addition to specific deterrence, it is important that any sentence given to the defendant serve as a deterrent to others who would work with straw buyers or real estate agents in an effort of further mortgage fraud. The message must be that those who defraud banks and mortgage lenders for their own personal gain will be punished appropriately,

and that when they do that over an extended period of time and cause millions of dollars in loss, the punishment will be serious. A substantial period of incarceration is necessary to send the appropriate deterrent message.

### 3. Sentences of Others Involved in the Conspiracy

Finally, a sentence of 97 months is appropriate in light of the other sentences imposed in this case. Ruben Rojas, Lourdes Rojas Almanza, and Litcia Linares have been sentenced for their respective roles in this conspiracy. Jorge Mendez has also been sentenced for his role in an unrelated but similar conspiracy in which the defendant was a participant. The government believes it is instructive for the Court to consider the sentences these other individuals received and how and why their cases differ from this defendant.

Ruben Rojas was one of the lead defendants charged in the conspiracy and he was held accountable for the total loss of the conspiracy of over $9 million. Like this defendant, Rojas received enhancements for the number of victims and for his leadership role in the scheme. However, unlike this defendant, Rojas also received a three-level reduction for acceptance of responsibility. As a result, his base offense level was 29 and his Guidelines range was 87 to 108 months of imprisonment. Judge Lee determined that a sentence of 100 months of imprisonment was appropriate given Rojas' role in the conspiracy. However, Judge Lee also granted the government's motion, pursuant to U.S.S.G. § 5K1.1, for a 40% reduction in Rojas' sentence based on his extensive cooperation with the government. As a result, Rojas received a total sentence of 60 months of imprisonment.

This defendant received the same Guidelines enhancements as Rojas for the number of victims and for his role in recruiting straw buyers into this scheme. However, unlike Rojas, the

defendant is not eligible to receive any reduction for acceptance of responsibility. The defendant's role in this conspiracy was admittedly less than that of Rojas. However, the Court must consider Rojas' sentence in light of his quick guilty plea and his cooperation — factors that distinguish Rojas from this defendant. Any sentencing comparison between this defendant and the co-conspirators should be based on the sentence the co-conspirators would have received prior to any sentencing reduction for cooperation. Thus, any relative comparison to Rojas should be to the baseline sentence of 100 months. In that regard, a below-Guidelines sentence of 97 months for this defendant — who received no credit for acceptance of responsibility and has a Guidelines range of 121 to 151 months — is reasonable when compared to the 100 month sentence for Rojas, who received a three-level reduction for acceptance of responsibility and had a Guidelines range of 87 to 108 months.

      Lourdes Rojas Almanza participated in the conspiracy as a real estate agent and loan officer. She participated directly in over a dozen fraudulent mortgage transactions resulting in a loss of $3 million. In order to facilitate the fraudulent transactions, Almanza created or caused to be created false and misleading documents, including bank statements, pay stubs, W-2s and Verification of Employment forms. She also transferred money into the bank accounts of straw buyers to create the appearance that the straw buyers had assets. Almanza's plea agreement held her accountable for approximately $3 million in loss and, unlike this defendant, she received no enhancements for the number of victims or her role in the scheme. However, Almanza attempted to flee the country prior to sentencing, and, as a result, lost her credit for acceptance of responsibility and received a two-level enhancement for obstruction of justice. Her total offense level was 26 and her Guidelines range was 70 to 87 months of imprisonment. Judge Lee

sentenced Almanza to 77 months. It is difficult to compare this defendant's culpability to that of Almanza because they played very different roles in the conspiracy. However, Almanza was involved in fewer transactions than this defendant and her conduct did not merit any increase in offense level based on the number of victims involved. In addition, this defendant recruited a significant number of other individuals into the scheme, which should be taken into account when comparing the two for sentencing purposes.

Litcia Linares played a limited role in the conspiracy and was involved in only a handful of transactions as a real estate agent. For one property transaction, Linares added a straw buyer to her bank account in order to falsely inflate the straw buyer's assets for purposes of his loan application. For another sale, Linares purchased a $15,000 cashier's check for a straw buyer to deposit into his own bank account, in order to create the appearance that the straw buyer had assets. On two occasions, Linares paid commissions to this defendant for his role in recruiting the straw buyers to purchase the properties. Linares was held accountable for more than $400,000 but less than $1 million in loss, based on her direct involvement in the conspiracy. She also, unlike this defendant, received no enhancements for the number of victims involved or her role, resulting in a total offense level of 18 and a Guidelines range of 27 to 33 months of imprisonment. Judge Lee sentenced Linares to 27 months.[2] Again, this defendant is far more culpable than Linares and his conduct warrants a significantly higher sentence than the one Linares received.

Finally, Jorge Mendez was sentenced by Judge O'Grady for his role in a separate real

---

[2] Linares also testified at trial and a Rule 35 motion is pending before Judge Lee. The government has requested that Linares receive a 33% reduction in sentence based on her cooperation.

estate conspiracy. Although Mendez's scheme was very similar to that perpetrated by the Rojas family, his was much shorter in duration and the total loss resulting from his conduct was far lower. Mendez was held accountable for approximately $1.9 million in loss and received no enhancements for the number of victims or his role in the scheme. His total offense level was 21 and the Guidelines range was 37 to 46 months of imprisonment. The government also filed a § 5K1.1 motion for a 33% reduction in Mendez's sentence based on his cooperation and testimony at trial. Judge O'Grady granted the motion and sentenced Mendez to a total of 27 months of imprisonment. Without the § 5K1.1 motion, Mendez's sentence would have been 40 months.

Although this defendant's conduct did not rise to the level of Ruben Rojas, there is no doubt that he is more culpable than Litcia Linares (who played a very limited role in this conspiracy) and Jorge Mendez (who shared the profits 50/50 with this defendant in a separate conspiracy of shorter duration and with significantly lower losses). In addition, this defendant's role was quite different from — and difficult to compare to — that of Lourdes Rojas Almanza. Ultimately, a sentence of 97 months of imprisonment is fair in light of the sentences these other individuals received, given their respective roles in the conspiracy and, with the exception of Almanza, their acceptance of responsibility and cooperation with the government.

**III.   Restitution**

The government respectfully requests that, as part of its sentence, the Court order restitution for the full loss amount of the conspiracy, to be paid jointly and severally with other individuals involved in this conspiracy. At the present time, based on loss statements received from the lenders involved in these transactions, the government has calculated the total loss to be

approximately $9,247,853.00.[3]

**IV.    Conclusion**

Based on the foregoing, the government respectfully submits that a sentence of 97 months of imprisonment is reasonable, but not greater than necessary, to achieve just punishment in this case.  A sentence of 97 months is appropriate in light of the nature of the defendant's criminal conduct and his refusal to accept responsibility for his actions.  Such a sentence would account for the substantial loss and the number of victims affected by this far-reaching conspiracy, as well as the defendant's role as a recruiter in the conspiracy.  A sentence of 97 months is also reasonable in comparison to the sentences the defendant's co-conspirators have received.

                Respectfully submitted,

                Neil H. MacBride
                United States Attorney

By:          /s/
                Marla B. Tusk
                Assistant United States Attorney
                2100 Jamieson Avenue
                Alexandria, Virginia 22314
                Phone:  703-299-3700
                Fax: 703-299-3981
                Email Address: marla.tusk2@usdoj.gov

---

[3] This amount does not reflect the losses sustained to lenders as a result of the defendant's participation in the Jorge Mendez conspiracy, which was not charged in the Superseding Indictment.

CERTIFICATE OF SERVICE

      I hereby certify that on the 15th day of October, 2010, I electronically filed the foregoing Position of the United States With Respect to Sentencing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Dwight Crawley
Counsel for Fidelino Ferrufino
vadclawyer@aol.com

A copy has also been sent via email to:

Nina Blanchard
Senior U.S. Probation Officer
nina_blanchard@vaep.uscourts.gov


                                                                  /s/
                                    Marla B. Tusk
                                    Assistant United States Attorney
                                    2100 Jamieson Avenue
                                    Alexandria, Virginia 22314
                                    Phone:  703-299-3700
                                    Fax: 703-299-3981
                                    Email Address: marla.tusk2@usdoj.gov